THE STATE v. MAX SHAPIRO, Appellant.

Division Two, February 2, 1909.

1. **MOTION FOR NEW TRIAL: Within Four Days: Sufficient Recital.** Where the record discloses that the verdict was returned on a certain day, and "thereupon the said defendants by their attorney filed their motion for a new trial herein," and that defendant was on the same day admitted to bail to appear from day to day to answer to his motion for a new trial, it sufficiently appears that the motion. was filed within four days after the verdict.

2. **RECEIVING STOLEN GOODS: Charged as Copper: Proof of Brass.** The State is not so bound by the testimony of its own witness as to be precluded from disproving it by the testimony of other witnesses. Defendant was charged with receiv-

ing "ten bars of new copper metal," knowing them to have been stolen, and two witnesses testified that they stole ten bars of copper, and they and another that ten bars of copper were sold to defendant who received them. Another witness for the State, from whom the metal was stolen, testified that he had no copper but that eleven bars of brass were stolen, and that brass and copper were very different substances. *Held*, that the State was not concluded by the testimony of this witness, and the testimony of the other witnesses was sufficient to submit to the jury the issue made by the information that it was copper, and not brass, that was stolen and received by defendant.

3. ———: Evidence: In Contradiction of Immaterial Matter. It is not error to exclude testimony in contradiction of testimony produced by the State immaterial to the issues. Where defendants were being tried for receiving stolen copper on March 30th, and the State's witness testified that they traded for a horse on that day, it was not error to refuse to permit defendants to show that the only horse transaction they had during the month of March was on March 13th. The impeaching or contradictory evidence should have been directed to the occurrence on March 30th.

4. ———: ———: Rejection: No Offer. Where a witness is not permitted to answer a question, the judgment will not be reversed unless appellant offers to show what the testimony would be.

5. ———: Instruction: Withdrawal: Accomplice. It is not error for the court to withdraw an erroneous instruction, and to orally inform the jury that it is withdrawn and not to consider it. Where defendant was being tried for receiving stolen goods, and the principal witness against him was the boy who stole the goods, it is not proper to tell the jury that such boy and defendant were accomplices and that the testimony of the boy should be received with great caution; and the court, having given such instruction, did not commit error when its attention was called to it, in withdrawing it.

6. ACCOMPLICE. The receiver of stolen goods, knowing them to have been stolen, and the thief who alone stole them, are not accomplices.

7. RECEIVING STOLEN GOODS: Must be Those Stolen: Copper: Brass. The accused cannot be charged with receiving ten bars of copper metal, knowing it be stolen, and convicted of receiving brass, knowing it to be stolen. Copper and brass are not the same. The State's witness testified that copper is a basic metal, an ore; and that brass is a compound of various metals, namely, copper, tin, zinc and lead; and that he had no copper, that none was stolen from him, but that eleven ingots

of brass were stolen. *Held,* that defendant cannot, on such testimony, be convicted of receiving ten ingots of copper knowing them to have been stolen.

8. ———: ———: **Instruction.** The defendants were charged with receiving ten bars of new copper metal, knowing them to have been stolen, and witnesses for the State testified that they stole ten bars of copper from the Standard Smelting Company and sold them to defendants, but the manager and principal owner of that company testified that it did not deal in copper, that no copper was stolen, but eleven ingots of brass were stolen, and that copper and brass were very different metals. The instruction told the jury that if they believed "the property described in the information, to-wit, ten bars of new copper metal or ten bars of metal of the description mentioned in the evidence," were stolen from the Standard Smelting Company, their verdict should be guilty. *Held,* that the information charged one crime, namely, the receiving of stolen copper, and the instruction erroneously permitted them to be convicted of another crime, namely, the receiving of stolen brass, whereas there was no evidence at all that they had received any stolen brass.

9. ———: ———: ———: **Cured by Another.** Nor was the error of said instruction cured by another telling the jury that defendants were on trial for buying and receiving, knowing them to have been stolen, ten bars of new copper metal on or about March 30, 1907, and upon no other charge of having received stolen property. The obvious purpose of this instruction was to confine the jury to the transaction of March 30th, and prevent them from finding defendants guilty on proof of previous thefts and receipt of stolen copper. It did not purport to change the direction of the other instruction.

10. ———: ———: ———: ———: **Jeofails.** The Statute of Jeofails cures many defects in evidence, but it does not permit the State to charge a defendant with stealing specific property of one kind and convict him of stealing another and distinct property. And even if it did, it would be violative of the constitutional provision that "in criminal prosecutions the accused shall have the right to demand the nature and cause of the accusation" against him.

Appeal from St. Louis City Circuit Court.—*Hon. Geo. H. Williams, Judge.*

REVERSED AND REMANDED.

*C. Orrick Bishop* for appellant.

The court erred in overruling appellant's objection to any further evidence under the information and in overruling appellant's demurrers to the evidence. The information specifically described the property alleged to have been stolen from the Standard Smelting Company, and afterwards received by appellant, as ten bars of new copper metal. There was no evidence whatever that any new copper metal was stolen from that company on or about the 29th or 30th of March, nor that appellant received any new copper metal at or about that time. The evidence showed that some brass had been stolen from that company on the 29th or 30th of March, and tended to show that what was thus stolen was by the thief sold to appellant. According to the testimony of the only witness on that point (the manager of the company), copper and brass are commonly known as entirely separate and distinct articles commercially: "If one were to order copper he would not be understood as asking for brass, nor *vice versa.*" There was an absolute failure of proof of the stealing and the receiving of the article charged in the information to have been stolen and received. State v. Plant, 209 Mo. 312. The error of the court in overruling the objection and demurrers was accentuated in the instructions. Would the information be sustained by proof that the property alleged to have been stolen was iron, zinc, tin, antimony? And is there not as much difference, under the evidence, between 10 bars of new copper metal and 10 ingots of brass, as between a diamond stud and a diamond ring? State v. Plant, supra. A defendant has the right to know the nature and the cause of the accusation against him, and the informant has no right to accuse him of one thing and then to prove him guilty of another. Com. v. Gavin, 121 Mass. 54.

State v. Shapiro.

*Elliott W. Major,* Attorney-General, and *James T. Blair,* Assistant Attorney-General, for the State.

Instruction 2, as given, is not objectionable. Appellant contends that it permitted the jury to convict for receiving stolen brass, "mentioned in evidence" by Hess, whereas, the information charges the receiving of "new copper metal." For more than one reason this contention must fail. (1) The evidence nowhere shows a theft of brass by Flannery and Tross, nor does it anywhere intimate the sale of brass to defendant. (2) Instruction 4 clearly requires the jury to confine its investigations to the question of receiving ten bars of new copper metal, and forbids them to convict for anything else. (3) Further, brass is not included in the terms of instruction 2, "ten bars of metal of the description mentioned in evidence," because brass is an alloy, and is not a metal. The encyclopaedists and lexicographers all define a metal as "an element," "an elementary substance." Standard Dictionary, Century Dictionary, Ency. Britannica, Ency. Americanna, Johnson's Universal Ency., Rees' Cyc. If defendant feared that the jury might misunderstand the term metal, he should have asked an instruction defining it. This he failed to do. (4) the jury could not, under the evidence and instructions, have been misled. Defendant was not prejudiced by this instruction under the circumstances in this case. State v. Paulsgrove, 203 Mo. 205. (5) The case of State v. Plant, 209 Mo. 307, cited by appellant, is not applicable. There defendant was charged with stealing a diamond ring. The proof was that he stole a diamond stud. The diamond in each was the same, and it is true that the two articles are entirely different. It is also true that brass and copper are entirely different things. But here the resemblance of that case to this ends. For, in the present case, appellants were charged with receiving stolen copper. The proof showed

that they received copper and that the jury were instructed (Inst. 4) to find them not guilty unless they found that they received, with guilty knowledge, "ten bars of new copper metal." In the face of this the contention as to Hess's testimony showing a variance cannot stand. No objection to Hess's testimony was made on proper grounds and the later testimony as to the theft and receiving of copper was competent. Hess's testimony did not estop the State from making out its case by other witnesses.

GANTT, P. J.—At the April term, 1907, of the circuit court of the city of St. Louis, the circuit attorney filed an information charging that defendant jointly with one Lipschitz did in the city of St. Louis on the 30th of March, 1907, feloniously buy, receive and have ten bars of new copper metal of the value of fifty dollars of the goods and chattels of the Standard Smelting Company, a corporation, then lately before feloniously stolen from said Standard Smelting Company, then and there well knowing the same to have been feloniously stolen, etc.

The defendants were arraigned on May 8, 1907, and put upon their joint trial on the same day. They were each convicted and their punishment assessed at two years in the penitentiary. On the same day a motion for new trial was filed by defendants, which was afterwards overruled and a motion in arrest was also filed and overruled. And the defendants were each separately sentenced to the penitentiary. The defendant Shapiro alone filed a bill of exceptions and perfected his appeal to this court.

The evidence on the part of the State tended to show that the Standard Smelting Company was a Missouri corporation, with its place of business at number 948 Chouteau avenue in the city of St. Louis, at which place it kept scrap metals of all kinds and also ingot metals. That on March 29, 1907, there were ingots

of brass in the building near a door opening upon an alley, and on the following morning eleven ingots of brass were missing, weighing about eighteen or twenty pounds each, and this missing brass was never recovered. Mr. G. W. Hess, one of the owners of this business, testified that on the night of the 29th of March, 1907, they did not have on hand any copper metal. He was positive that the metal stolen from his place of business was brass. He testified that copper is original metal, it is composed of copper ore smelted. There was no such original metal as brass, that in the business world copper and brass are commonly known as entirely separate and distinct articles in a commercial sense, and the same is true in the arts and sciences; that copper is a basic metal, and brass is a compound made from various elements, to-wit, copper, tin, zinc and lead. After Mr. Hess had so testified the defendant objected to any further evidence under the information, on the ground that the charge was for receiving stolen copper knowing it to be stolen, whereas the proof had demonstrated that the ingots that were stolen were brass; this objection was overruled, and defendant duly excepted.

The State then introduced another witness, one Harry Flannery, a boy about sixteen years old, who testified that on March 30th he had a transaction with the defendant about copper; that he, witness, and another boy, Eugene Tross, had broken into the foundry of the Standard Smelting Company and stolen ten bars of copper from that company about ten o'clock at night and hid the same in an ash pile in an alley near Twelfth street and Chouteau avenue; that he went to defendant Shapiro's house the next morning, March 30th, and told him he had some copper and if he had a wagon they could go down and get it. Defendant said he had no wagon at that time, but he would try and find one. They left the house and went up town, nothing having been said about the price he was to

receive for the copper, and met the other defendant Lipschitz, who had a horse and wagon. The defendant had some private conversation with Lipschitz out of the hearing of the witness, who said he saw defendant hand Lipschitz a yellow-back bill which appeared to the witness to be a twenty-dollar bill; that during this time they were trading for a horse, which trade was finally consummated, and defendant then told Lipschitz to go with the witness, and the latter and the witness got on a wagon and rode to the place where the copper was said to have been concealed and there the witness with two other boys, Eugene Tross and John O'Brien, passed ten bars of copper to Lipschitz, who covered it with rags as he placed it in the wagon and, after giving witness twenty dollars, drove off. Over the objection of the defendant Flannery also testified that about three weeks before that time, he had sold defendant one bar of copper for two dollars, which witness had stolen from the Standard Smelting Company, and he told the defendant at the time that he got it at the Standard Smelting Company's place; the defendant told him to go back and get some more and defendant would buy it at the same price, giving witness his address on a card, which witness threw away. On cross-examination Flannery stated that he was arrested some time after this transaction and that he had stoutly denied all knowledge of the alleged theft and when confronted with defendant and Lipschitz in the police office maintained that he had never seen them before; that he had never implicated the defendant in the transaction in any way until after he had a talk in the jail with one Red King, a prisoner in the jail, after which he was taken from the jail to the office of the assistant prosecuting attorney, and there had made statements which led to this charge against the defendant.

Eugene Tross also testified that he had helped Flannery steal copper from the Standard Smelting

Company's place, and saw a wagon loaded with the bars and afterwards received ten dollars from Flannery.

John O'Brien testified that he helped to load the wagon and saw Flannery ride away with Lipschitz.

At the close of the State's evidence the defendant requested an instruction for acquittal, which was refused and exceptions saved. On the part of the defendant there was evidence tending to show that he was a man of good character and also evidence tending to show that March 30, 1907, was the conclusion of the Jewish Easter, when services were held in the Jewish place of worship, and that the day was a Jewish holiday; that on that day the defendant Lipschitz came to defendant's house about 8:30 in the morning and they together went to the Jewish church on Fifteenth and Wash streets and attended the services there, remaining there until noon; that they both accepted an invitation to dinner with a mutual friend, to whose house they went and remained until two o'clock; that no one came to the defendant's house that morning inquiring for him as testified by Flannery, and that the time embraced by the evidence of *alibi* covered the time when Flannery and the others claimed to have had the transaction with the defendant and Lipschitz. The defendant testified in his own behalf that on March 30, 1907, he spent the forenoon at the Jewish church and went at once from there to his friend's house to dinner where he remained until two o'clock; denied positively ever having any transaction with Flannery or having bought anything at any time from him; that he saw Flannery for the first time when confronted with him at the police office some time after the alleged transaction and the second time in jail after defendant was confined on this charge. The testimony of the defendant as to the *alibi* and denying the alleged transac-

tion with Flannery was corroborated by the testimony of his codefendant Lipschitz and defendant's wife.

While defendant was a witness he offered to show that the only horse transaction he and his codefendant had during the month of March, 1907, was on the 13th of that month, some three weeks before the alleged offense, when they purchased a horse and received a bill of sale therefor; he also offered to prove that Red King, the man alluded to by Flannery in the jail and to whom Flannery admitted he first accused defendant, was in jail on the charge of having burglarized defendant's stable and stealing defendant's horse; all of which testimony was excluded by the court upon objection by the State. At the close of all of the evidence defendant renewed his motion for an acquittal, which was overruled and he excepted.

It appears from the record that the court read to the jury an instruction as to the testimony of accomplices, which instruction is not set out, but said afterwards to the jury, "I think, gentlemen of the jury, I had better withdraw that instruction number four, which I read to you in regard to the testimony of accomplices; my attention has been directed to the fact that the instruction is probably incorrect and you will not regard that instruction, which I gave you in regard to the special caution with which the testimony of an accomplice should be received," and thereupon the said instruction was eliminated from the charge. The defendant then offered an instruction on that point, which was refused upon objection by the State.

I. Before proceeding to the consideration of the errors assigned by the defendant, it is essential to pass upon the proposition advanced by the Attorney-General that the record does not disclose that the motion for new trial was filed within four days after the verdict. This is based upon the recital in the record that "thereupon the said defendants by their attorney filed

their motion for new trial herein,'' and it is insisted that this is too indefinite to satisfy the requirements of the statute; that a motion must be filed in four days. We are of the opinion that this position is not tenable, for the reason that the record discloses that the verdict was rendered on May 9, 1907, the day of the conclusion of the trial, and on the same day the motion for new trial was filed, and the defendant was admitted to bail to appear from day to day in answer to his motion for new trial and in arrest of judgment.

II.  The principal ground upon which a reversal is sought in this case is that there was an absolute failure of proof of the stealing and the receiving of the articles charged in the information to have been stolen and received.  The information specifically described the property stolen from the Standard Smelting Company and afterwards received by the defendant as ''ten bars new copper metal.''  And it is earnestly insisted that there was no evidence whatever that any new copper metal was stolen from said company on or before the 29th or 30th of March, nor that the defendant received any new copper metal at or about that time.  The evidence of Mr. Hess, one of the owners of the Standard Smelting Company, was that eleven ingots of *brass* were stolen from his company on the 29th or 30th of March, 1907, and that the company had no copper ingots on hand at that time, but the evidence of Flannery and Tross and O'Brien was to the effect that they had stolen ten bars of copper from the premises of the Standard Smelting Company about ten o'clock of the night of the 29th of March, 1907, and hid the same in some ash pile, next morning sold the same to the defendant, and their evidence clearly tended to show that these copper bars thus

216 Sup—24

stolen by them were known by the defendant to have
been stolen by them at the time he bought and received
the same from them.  If the State was estopped by the
testimony of Mr. Hess that the metal was brass and
not copper as alleged in the information, the conten-
tion of the defendant would be unanswerable, but there
was ample other evidence, if believed by the jury, to
establish that the bars of metal were of copper and not
brass and the court properly overruled the request for
an instruction of acquittal.  It is true a party is not
permitted to impeach his own witness, directly by evi-
dence of bad character  for truth and veracity or in-
directly by evidence of his having made statements out
of court contrary to those made by him on the witness
stand, but in this State at least he is not estopped by
the testimony of the witness and is not *bound* by it, so
as to be precluded from disproving it by the testimony
of other witnesses. [Brown v. Wood, 19 Mo. 475;
Dunn v. Dunnaker, 87 Mo. 597; Meyer Bros. Drug Co.
v. McMahan, 50 Mo. App. 18, and cases cited.]

The jury might have concluded that Mr. Hess
might have been mistaken as to the company not hav-
ing any copper bars on hand at the time of the theft
in view of the very clear statement of Flannery, Tross
and O'Brien that they did steal copper bars and sell
them to defendants.  This conclusion in no sense mil-
itates against our decision in State v. Plant, 209 Mo.
307.

III.   There was no error in excluding the bill of
sale, evidencing the horse trade on the 13th of March,
1907.  Flannery's evidence as to the horse trade was
immaterial and defendant and Lipschitz and Dierkes
all testified to the horse transaction on the 13th of
March.  There was no controversy about the sale.  It
was irrelevant to the issue and the proof that they
bought a horse from Dierkes on the 13th, did not dis-
prove Flannery's evidence as to the horse trade on

the 30th of March. The impeaching or contradictory evidence should have been directed to the truth of Flannery's statement as to the occurrence on the 30th of March. But the bill of sale has not been preserved and we cannot judge of its materiality. [State v. Foister, 202 Mo. l. c. 48.]

IV. As to the rejection of defendant's answer to the question, "What, if anything, happened with respect to you and Red King?" no offer was made as to what the testimony would be and it is settled that a judgment will not be reversed on such a showing alone. [Jackson v. Hardin, 83 Mo. l. c. 187.]

V. There was likewise no error in withdrawing the instruction cautioning the jury against the testimony of accomplices. The receiver of stolen goods knowing them to be stolen, is guilty of an offense separate and distinct from the larceny of the goods. And the offenders are not accomplices in the meaning of the law. [State v. Kauhlman, 152 Mo. 104.]

VI. The second instruction given by the court was in these words: "If you believe and find from all the evidence before you, beyond a reasonable doubt, that the property described in the information, to-wit, ten bars of new copper metal or ten bars of metal of the description mentioned in the evidence, was unlawfully and fraudulently stolen from the possession of the Standard Smelting Company by some person or persons other than the defendants, with the intent on the part of the person or persons so stealing such property to unlawfully and fraudulently convert the same to his or their own use, and to permanently deprive the said Standard Smelting Company of the use of said property, without its consent; that said property was the property of the Standard Smelting Company; that said Standard Smelting Company was then and there a corporation; that after the said property was so stolen as aforesaid, by some

person or persons other than the defendants, they the said Harry Lipschitz and Max Shapiro, at the city of St. Louis and State of Missouri, and on or about the 30th day of March, A. D. 1907, did unlawfully and fraudulently buy, receive and have into their possession the said property, knowing at the time they so bought, received and had said property that it was stolen from the Standard Smelting Company, that they so bought, received and had said property for the fraudulent purpose of aiding the thief or thieves of said property or with the fraudulent intent of permanently depriving the Standard Smelting Company of its said property without its consent; that the property so bought, received and had by the defendants (if you believe and find from the evidence that they did so buy, receive and have the same) was of the value of thirty dollars or more, you should find the defendants guilty of receiving stolen property, knowing it to be stolen, as charged in the information, and, unless you so believe and find the facts to be you should find the defendants not guilty.'' To the giving of which instruction defendants at the time objected and excepted.

This presents the most serious proposition in the record. Had there been no difference as to the character of the property alleged to have been stolen, and knowingly received by defendants, there would have been no doubt as to the propriety of this instruction, but in view of the testimony of Hess that the bars of metal were *brass* and that his company had no *copper* bars on hand at the time of the theft and the evidence of Flannery and Tross that the metal bars were copper, the language of the instruction, directing the jury that if they believed that the property described in the information, to-wit, ten bars of new copper metal, *or ten bars of metal of the description mentioned in the evidence,* was stolen and that defendants did unlawfully and fraudulently buy and re-

ceive and have in their possession the *said* property, knowing at the time that it had been stolen, etc., they would find them guilty, authorized the jury to find them guilty if they found that the bars of metal stolen and received were either copper as charged in the information or were *brass* as testified to by Mr. Hess in his testimony. In other words, the guilt of defendants was predicated upon one of either alternatives, to-wit, in the first instance, if they found that copper bars were stolen and received, and in the other if they found bars of metal *mentioned in the evidence.* Not only were brass bars mentioned in the evidence, but Mr. Hess testified the bars of metal stolen from his company that night were *brass* and they had no copper at that time. The instruction in a word permitted the jury to find defendants guilty even though they should find that property not described in the information was stolen and with the receiving of which they were neither charged or notified in the information.

It is true that in another instruction the court directed the jury that the defendants were on trial for buying and receiving, knowing them to be stolen, ten bars of new copper metal, on or about March 30, 1907, and upon no other charge of receiving stolen property, and the Attorney-General insists that in view of this instruction, the jury could not have been misled. But when this instruction is read its obvious purpose was to confine the jury to the transaction of March 30, 1907, and prevent them from finding defendants guilty on proof of the previous thefts and receipt of stolen goods before that time. It did not purport to change the direction of the court that the finding of the theft of either the copper bars described in the information or others mentioned in the evidence, on March 30, 1907, would justify a verdict of guilty. The Constitution of this State, section 22, article 2, provides that "in criminal prosecutions the

accused shall have the right . . . to demand the nature and cause of the accusation" against him. He cannot be charged with stealing horses and convicted on proof that he stole hogs. Neither can he be charged with stealing copper and convicted on proof of stealing brass. Nor does the fact that copper is one of the constituents of brass change the case. When the copper is mixed with lead, zinc and tin, the result is brass and no longer copper, and they are regarded and known as separate and distinct metals in trade, and in the arts and sciences. The description of the metal bars as "new copper metal" cannot be treated as surplusage but must have been proved substantially as alleged. [Wharton's Crim. Ev., sec. 146; State v. Ballard, 104 Mo. 634; State v. McGraw, 74 Mo. 574; State v. Babb, 76 Mo. 501.]

While our Statute of Jeofails cures many defects in evidence, it does not permit the State to charge a defendant with stealing specific articles of property of one kind and convict him of stealing other and distinct property. If it did it would be a clear violation of the constitutional provisions above noted. In our opinion the instruction was erroneous and misleading and authorized the jury to find defendant guilty if he bought and received either ten bars of new copper metal or ten bars of brass, mentioned in the evidence of Mr. Hess, the owner of the stolen property which defendant was charged with receiving knowing it to be stolen. The instruction should have been confined to the copper bars and the jury should not have been left to find him guilty if they believed he had purchased and received the ten bars of *brass* from Flannery, knowing them to be stolen, which we think the instruction permitted, and which the evidence of Hess tended to prove he did do. For the giving of this instruction the judgment must be and is reversed in order that a new trial may be had. All concur.